IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT JACKSON

Assigned on Briefs October 3, 2017

## STATE OF TENNESSEE v. DAVID WAYNE PHILLIPS

**Appeal from the Circuit Court for Tipton County**
No. 8199   Joe H. Walker, III, Judge

_____

### No. W2016-02087-CCA-R3-CD

_____

The Defendant, David Wayne Phillips, was convicted by a Tipton County jury of initiating the manufacture of methamphetamine and was sentenced by the trial court to ten years in the Tennessee Department of Correction. On appeal, the Defendant challenges the trial court's denial of his motion to suppress statements made to an officer after the Defendant consented to a search of his bedroom. The Defendant also argues that the evidence is insufficient to support his conviction. After a thorough review of the record, we affirm the judgment of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Circuit Court Affirmed**

JOHN EVERETT WILLIAMS, J., delivered the opinion of the court, in which NORMA MCGEE OGLE and ALAN E. GLENN, JJ., joined.

David A. Stowers, Covington, Tennessee, for the appellant, David Wayne Phillips.

Herbert H. Slatery III, Attorney General and Reporter; Jonathan H. Wardle, Assistant Attorney General; Mike Dunavant, District Attorney General; and James Walter Freeland, Jr., Assistant District Attorney General, for the appellee, State of Tennessee.

### OPINION

### FACTUAL AND PROCEDURAL HISTORY

Following a search of his residence, the Defendant was charged with the initiation of the manufacture of methamphetamine, the promotion of the manufacture of

methamphetamine, aggravated child abuse, and simple possession of methamphetamine. The aggravated child abuse charge was dismissed prior to trial, and the simple possession charge was dismissed during trial.

On April 16, 2014, Investigator Brandon Williams of the Tipton County Sheriff's Department received information from Phillip Lewis that Shannon Lewis and the Defendant were manufacturing methamphetamine at the residence of Ms. Lewis. Investigator Williams conveyed this information to Deputy Chris Smith, who searched for Ms. Lewis's name in the TIMIS Registry, which maintains a record of the time and location of Sudafed purchases. Deputy Smith testified that the TIMIS Registry showed that Ms. Lewis had purchased Sudafed the previous day. Deputy Smith and Sergeant Jeffery Thompson then went to Ms. Lewis's residence. Upon arrival, Deputy Smith parked his car in the driveway.

When Deputy Smith knocked on the door, Ms. Lewis stepped outside to speak with him. Deputy Smith asked Ms. Lewis about her purchase of Sudafed from the previous day. Ms. Lewis stated that several people in the residence needed Sudafed for their sinuses. She was unable to produce the box of Sudafed she purchased the previous day.

Ms. Lewis orally consented to the search of her purse and personal items. After searching the purse, Deputy Smith found a small plastic bag with residue that tested positive for methamphetamine. He then asked for permission to search the residence, and Ms. Lewis gave her oral consent.

The Defendant, Tasha Eason, and the Defendant's granddaughter were inside the house. Deputy Smith testified that he did not smell any odor indicative of methamphetamine manufacturing when he entered the residence. The Defendant told Deputy Smith that the back bedroom was his and gave oral consent to search his bedroom. Deputy Smith explained that he did not ask the Defendant to sign a written consent form because there was an audio recording of the conversation. Deputy Smith also searched the Defendant's bathroom. The bathroom was adjoined to the bedroom, in that someone would have to go through the Defendant's bedroom to access the bathroom. Deputy Smith explained that he did not ask the Defendant to sign a written consent form because there was an audio recording of the conversation.

Deputy Smith first noted that silver tape was wrapped around the interior doorframe inside the Defendant's bedroom. Deputy Smith found what appeared to be methamphetamine on a glass plate. Next to the plate was burned aluminum foil, which Deputy Smith testified is indicative of the use of methamphetamine. In the Defendant's bedroom and the adjoining bathroom, Deputy Smith found a pill grinder, a small plastic

bag with ammonium nitrate, lithium batteries, muriatic acid, coffee filters, a cold pack, needle-nose pliers with burn marks on the ends, and two drink bottles filled with a clear liquid. Deputy Smith asked the Defendant about the clear liquid in the two bottles. Originally, the Defendant said the liquid was water. Deputy Smith again asked the Defendant what the liquid was, and the Defendant said it was fuel.

Deputy Smith testified that he is certified in the investigation of methamphetamine, including the identification of items used in the manufacture of methamphetamine. He described how each item found in the Defendant's bedroom and bathroom could be used as an ingredient or tool in the methamphetamine manufacturing process. Deputy Smith also found a "one-pot methamphetamine bottle," which he explained is a term used to describe a quick methamphetamine manufacturing process using a bottle. He further explained that the residue in the bottom of the bottle was the by-product of chemicals being mixed inside the bottle. Deputy Smith found two additional bottles, and it appeared that "several items had been mixed together in th[e] bottles."

According to Deputy Smith, he asked the Defendant if there were any more "precursors," or items used in the manufacturing process, inside the house. Deputy Smith gave the Defendant several examples of precursors, including tubing. The Defendant said there was a bag in his bedroom. Deputy Smith testified that the Defendant walked to the bedroom and pointed to the area where the bag could be found. Inside the bag was an assortment of tubing, which appeared to have been used in the manufacturing process.

Deputy Smith testified that the items he found in the Defendant's bedroom and adjoining bathroom, taken as a whole, would constitute a "meth lab." In Deputy Smith's opinion, methamphetamine had been manufactured inside the bottles found in the bathroom. However, he acknowledged on cross examination that he could not determine when or where any methamphetamine would have been manufactured because it can be transported.

On cross examination, Deputy Smith explained that two days after the Defendant had been arrested and the residence quarantined, Mr. Lewis asked about retrieving some items from the residence. Deputy Smith was told by either Mr. Lewis or Ms. Lewis that the items would be located on the kitchen counter. When Deputy Smith went to look for the items, he discovered an eyeglass case on the counter containing methamphetamine.

A video recording was admitted as an exhibit at trial. The video camera was located inside the patrol car, which was parked in the driveway in front of the residence. The audio was provided by microphones attached to Sergeant Thompson's and Deputy Smith's persons. According to the audio from the recording, after obtaining consent from

Ms. Lewis to search the residence, Deputy Smith stepped inside the house to speak with the Defendant. Deputy Smith confirmed that the house was in Ms. Lewis's name, but that the Defendant lived there on a daily basis. The Defendant also confirmed in which room Ms. Lewis stayed and in which room he stayed. Deputy Smith asked the Defendant if there was anything illegal in the house of which he was aware before searching. Deputy Smith asked the Defendant if he was still on probation, and the Defendant said he was not. Deputy Smith briefly discussed the Defendant's previous record of the use of methamphetamine but confirmed with the Defendant that the Defendant did not have previous convictions involving the manufacture of methamphetamine. Deputy Smith asked the Defendant if there was anything in the house that would constitute methamphetamine manufacture, and the Defendant again responded that there was not.

The audio also recorded Deputy Smith asking the Defendant if he had any problem with the officers looking around the house, and the Defendant responded, "I don't reckon. It ain't my call." Deputy Smith clarified that he was making sure the Defendant was okay with the search. The Defendant's response was not clear. After speaking with Ms. Lewis again, Deputy Smith began searching the house. Before searching the Defendant's room, he asked, "Sir, do you want to come back here with me . . . just so you can be in here with me while I look around?" While Deputy Smith searched the Defendant's bedroom and bathroom, a conversation occurred between Deputy Smith and the Defendant that is consistent with Deputy Smith's testimony at trial. After his initial search, Deputy Smith said to the Defendant, "Let's walk back in here. Come into the kitchen for me if you don't mind." Once they were in the kitchen with Sergeant Thompson, Ms. Lewis, and Ms. Eason, Deputy Smith asked, "Since we're in the room together, what's going on?" At this point, Deputy Smith again asked about the clear liquid in the bottles, and the Defendant said it was fuel. Deputy Smith asked if there were any other precursors in the house, and the Defendant showed Deputy Smith where the bag of tubing was located.

Ms. Lewis testified at trial that she was aware that both Mr. Lewis and the Defendant manufactured methamphetamine at her house. She would purchase the Sudafed to give to either Mr. Lewis or the Defendant in exchange for methamphetamine. She stated that at the time the residence was searched, she had not received any methamphetamine from the Defendant in the past month to six weeks, and that it had been a long time since the Defendant and Mr. Lewis had manufactured anything.

The jury convicted the Defendant of the initiation of the manufacture of methamphetamine and acquitted the Defendant of the promotion of the manufacture of methamphetamine. In a subsequent sentencing hearing, the trial court sentenced the Defendant to ten years in the Tennessee Department of Correction. The Defendant filed a motion for a new trial, which the trial court denied. The Defendant filed a timely notice

of appeal challenging the trial court's denial of his motion to suppress his statements to law enforcement and the sufficiency of the evidence.

## ANALYSIS

### I. Motion to Suppress

The Defendant contends that the trial court erred in denying his motion to suppress statements made to Deputy Smith because the Defendant was "in custody" at the time the statements were made and had not been read his *Miranda* warnings. The State responds that the trial court correctly determined that the Defendant was not in custody. We agree with the State.

### A. Suppression Hearing

The video recording that was presented at trial was also admitted as an exhibit at the suppression hearing. Deputy Smith offered testimony during the suppression hearing that was consistent with the video recording and his testimony at trial. In addition, Deputy Smith testified that after finding the initial evidence that appeared to be consistent with the manufacture of methamphetamine, he walked the Defendant back to the kitchen and living room area. Deputy Smith testified, "And then once I had someone in there to secure them, I could go back and do a more thorough search . . . ." Deputy Smith asked the Defendant if there were "any other items, chemicals or what have you, for the processing" of methamphetamine. The Defendant responded that there was a bag of tubing and other items in a bag in the Defendant's bedroom.

Deputy Smith testified that when he pulled into the driveway, he parked his patrol car behind a car belonging to Ms. Eason. He testified that although his car was behind Ms. Eason's car, she could have left if she had asked to do so. Deputy Smith also testified that the Defendant made no attempts to withdraw his consent for the search of his room. At some point, however, the Defendant said he was done talking, and Deputy Smith stopped speaking to the Defendant. Deputy Smith also testified on cross examination that "[d]uring the investigation we're not going to let anybody leave."

Ms. Eason testified for the defense at the suppression hearing. She stated that she had taken the Defendant to the doctor that morning and that he received a shot to help with his medical problems. She explained that the shot "knocked him for a loop" and that he was in "la-la land." Ms. Eason testified that the Defendant refused to give Deputy Smith consent to search his bedroom and that the Defendant asked to call his attorney. She stated that a police officer walked past the Defendant after he refused to consent to the search and went into his bedroom anyway. She said that the officer was in the room

for about two minutes before returning to the living room to ask, "So I guess this meth that we found isn't yours?" and the Defendant responded, "[A]bsolutely not." Ms. Eason also testified that she did not remember her car being blocked in by the patrol car and that she felt like she could have gotten into her car and left if she wanted to do so. She described the officers as "very professional" and "the type of people I would want in my law enforcement locally."

The trial court found that although Ms. Eason testified that the Defendant refused to consent to the search of the house, the audio recording was clear in that the Defendant "was asked by the officer if he had any problem with the officers looking around the house, and the [D]efendant responded 'don't reckon, it ain't my call.'" In denying the Defendant's motion to suppress, the trial court determined that the Defendant was not in custody at the time the statements were made. The court considered several factors in its determination:

> The court considered the time and location of speaking with the defendant; the duration and character of the questioning; the lack of testimony as to a negative general demeanor of the officer; the suspect not being transported to the place of questioning, but being at his abode; the number of police officers present; the lack of limitation on movement or other form of restrain imposed on the suspect during speaking with the defendant; the interactions between the officer and the suspect, including the words spoken by the officer to the suspect, and the suspect's verbal or nonverbal responses; the extent to which the suspect is confronted with the law enforcement officer's suspicions of guilt or evidence of guilt; and finally, the extent to which the suspect is made aware that he or she is free to refrain from answering questions or to end the interview at will.

The trial court concluded that because there was no custodial interrogation of the Defendant, there was no requirement to give *Miranda* warnings, and thus, that the statements made by the Defendant should not be suppressed.

## B. Analysis

"On appeal from the denial of a motion to suppress, we review the trial court's legal conclusions de novo with no presumption of correctness." *State v. Dailey*, 273 S.W.3d 94, 100 (Tenn. 2009) (citing *State v. Walton*, 41 S.W.3d 75, 81 (Tenn. 2001); *State v. Yeargan*, 958 S.W.2d 626, 629 (Tenn. 1997)). This court defers to the trial court's findings of fact unless the evidence preponderates against such findings. *State v. Northern*, 262 S.W.3d 741, 747 (Tenn. 2008). "Questions of credibility of the witnesses, the weight and value of the evidence, and resolution of conflicts in the evidence are

matters entrusted to the trial judge as the trier of fact." *State v. Odom*, 928 S.W.2d 18, 23 (Tenn. 1996). The prevailing party is entitled to the strongest legitimate view of the evidence from the suppression hearing, as well as "all reasonable and legitimate inferences that may be drawn from that evidence." *Id.*

The Fifth Amendment to the United States Constitution and article I, section 9 of the Tennessee Constitution provide the accused with a right against self-incrimination. *See Walton*, 41 S.W.3d at 81. To insure this protection, the United States Supreme Court held in *Miranda v. Arizona* that "the prosecution may not use statements, whether exculpatory or inculpatory, stemming from custodial interrogation of the defendant unless it demonstrates the use of procedural safeguards effective to secure the privilege against self-incrimination." *Walton*, 41 S.W.3d at 82 (citing *Miranda v. Arizona*, 384 U.S. 436, 444 (1966)). *Miranda* warnings are only required, however, where the accused is interrogated while in custody. *Northern*, 262 S.W.3d at 749 (citing *Miranda*, 384 U.S. at 444, 476-77).

The test to determine whether a defendant is in custody at the time of an interrogation is "'whether, under the totality of the circumstances, a reasonable person in the suspect's position would consider himself or herself deprived of freedom of movement to a degree associated with a formal arrest.'" *Dailey*, 273 S.W.3d at 102 (quoting *State v. Anderson*, 937 S.W.2d 851 (Tenn. 1996)). In determining this "objective assessment," the trial court should consider the following non-exclusive factors:

> The time and location of the interrogation; the duration and character of the questioning; the officer's tone of voice and general demeanor; the suspect's method of transportation to the place of questioning; the number of police officers present; any limitation on movement or other form of restraint imposed on the suspect during the interrogation; any interactions between the officer and the suspect, including the words spoken by the officer to the suspect, and the suspect's verbal or nonverbal responses; the extent to which the suspect is confronted with the law enforcement officer's suspicions of guilt or evidence of guilt; and finally, the extent to which the suspect is made aware that he or she is free to refrain from answering questions or to end the interview at will.

*Id.* (quoting *Anderson*, 937 S.W.2d at 855). The determination of whether a suspect is in custody at the time of an interrogation is a fact-specific inquiry that examines the totality of the circumstances surrounding the interrogation. *Anderson*, 937 S.W.2d at 855.

Here, the Defendant argues that he was in custody at the time he made the statement that the clear liquid in the bottles was fuel and the statement about the location of the bag of tubing. The Defendant maintains that no reasonable person in his position would feel free to leave because two law enforcement officers arrived in uniform in a marked vehicle, remained in the residence for a lengthy period of time, searched the residence, and questioned the Defendant.

Applying the relevant factors to the facts of this case, we determine that the Defendant was not in custody at the time the statements were made. When the officers arrived at the residence, it was still daylight. The interrogation occurred in a house where the Defendant resided. The officers questioned the Defendant after Ms. Lewis consented to a search of the house, and the Defendant consented to the search of his bedroom. Although the Defendant notes that the officers were in the residence for a lengthy period of time, only a portion of that time was used to question the Defendant. The officer's tone of voice in the audio recording was calm and respectful. Ms. Eason testified that the officers were "very professional" and "the type of people I would want in my law enforcement locally." Only two law enforcement officers were present. The Defendant was not restrained at any time during the questioning, and when the Defendant said he did not want to talk, the questioning ceased.

The Defendant points to Deputy Smith's testimony that he was not going to allow anyone to leave while he was investigating. "'The question of whether a person has been seized, however, does not turn on the subjective impressions or intentions of the officer involved.'" *State v. Andrew Lay*, No. M1998-00257-CCA-R3-CD, 2000 WL 329948, at *4 (Tenn. Crim. App. Mar. 30, 2000) (quoting *State v. Green*, 929 S.W.2d 376, 379 (Tenn. Crim. App. 1995)). Instead, the "'only relevant inquiry is how a reasonable man in the suspect's position would have understood his position.'" *Id.* (quoting *Berkemer v. McCarty*, 468 U.S. 420, 442 (1984)). Even though Deputy Smith testified at trial that he would not have allowed the Defendant to leave during the investigation, nothing in the record suggests that this was communicated to the Defendant. Moreover, Ms. Eason testified that she felt she could have gotten into her car and left if she wanted to do so.

A reasonable person in these circumstances would not feel deprived of his freedom of movement to a degree associated with a formal arrest. *See State v. Maria A. Dills*, No. M2006-02161-CCA-R3-CD, 2007 WL 2745000, at *2, 5 (Tenn. Crim. App. Sept. 21, 2007) (holding a defendant was not in custody while questioned by two officers inside her home even though an officer testified at trial that the defendant would not have been free to leave if she wanted to do so); *Andrew Lay*, 2000 WL 329948, at *4 (holding a defendant was not in custody while questioned by an officer after poor performance on field sobriety tests even though the officer testified at trial that, at the time of questioning,

he intended to arrest the defendant). Thus, the trial court properly denied the Defendant's motion to suppress.

Moreover, even if there had been error in admitting the Defendant's statements at trial, any error would have been harmless beyond a reasonable doubt. *See State v. Climer*, 400 S.W.3d 537, 569-70 (Tenn. 2013). Even absent the Defendant's statements and the bag of tubing itself, the evidence against the Defendant is overwhelming. Deputy Smith testified at trial about the additional evidence found in the Defendant's room, and Ms. Lewis testified about her knowledge of the Defendant's involvement in the manufacturing of methamphetamine. In light of the evidence, it is clear that the Defendant would have been convicted even if his statements had been suppressed.

## II. Sufficiency of the Evidence

The Defendant argues that the evidence is insufficient to support his conviction for initiating the manufacture of methamphetamine because he did not admit to manufacturing methamphetamine, no contraband was found on his person, and Mr. Lewis was a known methamphetamine manufacturer who had free access to the Defendant's residence. The State maintains that the evidence is sufficient. We agree with the State.

When a defendant challenges the sufficiency of the evidence, this court must determine whether the evidence is sufficient "to support the finding by the trier of fact of guilt beyond a reasonable doubt." Tenn. R. App. P. 13(e). The appellate court examines the relevant statute to determine the essential elements for the offense and analyzes the evidence admitted at trial to determine whether each element is adequately supported. *State v. Stephens*, 521 S.W.3d 718, 723-24 (Tenn. 2017) (citations omitted). The court determines "'whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.'" *Id.* at 724 (quoting *Jackson v. Virginia*, 443 U.S. 307, 319 (1979)).

The standard of review remains the same regardless of whether the conviction is based upon direct or circumstantial evidence. *Id.* (citing *State v. Dorantes*, 331 S.W.3d 370, 379 (Tenn. 2011)). "'[T]he State is entitled to the strongest legitimate view of the evidence and all reasonable or legitimate inferences which may be drawn therefrom.'" *Id.* (quoting *State v. Harris*, 839 S.W.2d 54, 75 (1992)). This court does not reweigh the evidence. *Id.* (citing *State v. Evans*, 838 S.W.2d 185, 191 (Tenn. 1992)). Instead, "'a jury verdict, approved by the trial judge, accredits the testimony of the witnesses for the State and resolves all conflicts' in the testimony in favor of the State." *Id.* (quoting *Harris*, 839 S.W.2d at 75). The conviction replaces the presumption of innocence with a presumption of guilt. *Id.* (citing *Evans*, 838 S.W.2d at 191). On appeal, the defendant

has the burden of demonstrating why the evidence is insufficient to support the verdict. *Id.* (citing *State v. Tuggle*, 639 S.W.2d 913, 914 (Tenn. 1982)).

Tennessee Code Annotated section 39-17-435(a) provides that "[i]t is an offense for a person to knowingly initiate a process intended to result in the manufacture of any amount of methamphetamine." The term "initiates" is defined as "to begin the extraction of an immediate methamphetamine precursor from a commercial product, to begin the active modification of a commercial product for use in methamphetamine creation, or to heat or combine any substance or substances that can be used in methamphetamine creation." T.C.A. § 39-17-435(c).

Viewed in the light most favorable to the State, the evidence in the present case establishes that the Defendant was involved in initiating the manufacture of methamphetamine. In the audio recording, the Defendant consents to the search of a back bedroom, in which the Defendant confirms he resides. Within the Defendant's bedroom and adjoining bathroom, Deputy Smith found a bottle with methamphetamine residue inside of it, ammonium nitrate, a pill grinder, lithium batteries, muriatic acid, coffee filters, a cold pack, needle-nose pliers with burn marks on the ends, and two drink bottles filled with a liquid the Defendant acknowledged was fuel. Deputy Smith testified as to how each of these chemicals or tools could be used in the manufacture of methamphetamine. Deputy Smith also found methamphetamine in the Defendant's bedroom. Ms. Lewis testified at trial that she would purchase Sudafed and give it to the Defendant in exchange for methamphetamine. She also testified that she was aware that the Defendant was manufacturing methamphetamine inside the residence. Finally, after Deputy Smith asked if there were any other precursors in the house, the Defendant told Deputy Smith where a bag of tubing could be found inside his bedroom. Even if the Defendant's statements were to be excluded, the physical evidence found in the Defendant's room and the testimony from Deputy Smith and Ms. Lewis are sufficient. Accordingly, we hold that the evidence is sufficient to support the Defendant's conviction.

## CONCLUSION

Based on the foregoing, we affirm the judgment of the trial court.

_____
JOHN EVERETT WILLIAMS, JUDGE